THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARREN EASLEY

v.

JOHN WETZEL, *et al.*

CIVIL ACTION

No. 23-1718

Henry, J.                                                          March 30, 2026

## MEMORANDUM

Warren Easley is a state prisoner suing prison officials for several claims relating to his imprisonment, including both particular incidents and longstanding conditions, which he regards as cruel and inhumane and imposed without due process. Several of his claims survived a previous motion to dismiss by the officials, who now bring a motion for summary judgment on much of the remainder. The defendants' motion provides indications of its merit but ultimately fails to overcome Easley's (likely) denials on most grounds at this level. As discussed below, the Court will deny most of the motion for summary judgment, referring the parties for a settlement conference.

## I.    BACKGROUND

### A.  Factual Background

The Court has previously issued an opinion relating to a previous motion in this case, and I draw on our previous rendition of the background. Easley is currently incarcerated in the State Correctional Institution (SCI) Albion, in Albion, Pennsylvania. Easley initiated this action to redress injuries allegedly inflicted by the portion of defendants associated with the Commonwealth[1]

---

[1] The many defendants in this case come in two groups. The present movants, "Commonwealth defendants," are John Wetzel, George Little, Mandy Sipple, Jaime Sorber, Tabb Bickell, Joseph Terra, David Mascellino, Andrew Reber, Jamie Luquis, Kevin Young, Jonathan Hall, Dion

between 2015 and 2022 while he was an inmate at SCI Phoenix, another Pennsylvania prison. These claims arise out of beatings, threats, and other violent encounters with corrections officers Smits, Gonzalez, Kull, Voorhees, Martin, Mateus, Hunter, Brewer, Gilliard, Hamilton, and Thompson, and his alleged outright denial of medical and dental care or receipt of improper medical and dental care from Defendants Goldberg, Walsh, Annino, Bazel, DiFrangresco, Bianco and Trinh.[2] As addressed in the following section, a number of claims and defendants have been dismissed.

Of the remaining allegations, those that fall within the scope of this motion relate to allegations by Easley that he was improperly and cruelly left in an unsafe and disgusting cell on multiple occasions, that he was threatened and assaulted by correctional officers, and that he was unlawfully placed on the Restricted Release List for a period of nearly six years, a kind of solitary confinement during which his liberty and comfort were even more harshly restricted than his prison life beforehand. I address each of these in turn.

### B. Procedural Posture

Easley filed his complaint on May 3, 2023. Leaving aside the subset of counts that this Court dismissed previously, the counts that remain relate to, again under the Commonwealth Defendants' summary,

> [(1)] Eighth Amendment excessive force causes of action, arising from seven separate incidents of alleged excessive force, which apparently occurred on August 24, 2021, September 9, 2021,

---

Hunter, Matthew Kull, Kysherald Patterson, Ijia Phillips, James Nicholson, Richard Thompson, George Smits, Joseph Gonzalez, Devon Voorhees, James Martin, Anthony Talarico, Moises Mateus, Tyler Moser, Jeff Brewer, Jamal Gilliard, and Anthony Hamilton. A separate group is the "medical defendants," however the Court by previous order dismissed with prejudice the claims against all but one of these. Order of July 24 (as to motion by medical defendants) (ECF 55).

[2] Of these defendants, only Bianco and Trinh are employed by the Commonwealth. Defendants Bazel, Goldberg, Annino, and DeFrangresco (the "medical defendants") moved separately for dismissal or summary judgment. ECF 25.

October 31, 2021, April 20, 2022, April 22, 2022, April 26, 2022, and May 18, 2022;

(2) Eighth Amendment conditions of confinement causes of action, arising from five separate incidents of cell contamination, which apparently occurred on July 31, 2021, October 31, 2021, January 1, 2022, January 24, 2022, and May 16, 2022;

(3) Eighth Amendment failure to protect cause of action arising from a single incident which apparently occurred on October 31, 2021;

(4) Eighth Amendment condition of confinement cause of action arising out of conditions Plaintiff endured while on the Restricted Release List; and

(5) Fourteenth Amendment procedural due process cause of action arising out of Plaintiff's placement on the Restricted Release List and confinement in the Intensive Management Unit.

*Id.* at 3–4 n.1 (new lines inserted).

The Commonwealth Defendants moved on June 2, 2025, for summary judgment on all remaining counts *except* the Eighth Amendment excessive force claims relating to August 24, 2021; September 9, 2021; October 31, 2021; and April 20, 2022. That means that the motion relates to:

(a) Eighth Amendment ("8A") excessive force violations arising from incidents on April 22, 2022, April 26, 2022, and May 18, 2022;
(b) 8A failure to protect arising from an incident, perhaps October 31, 2021;
(c) 8A conditions of confinement violations, arising from incidents of cell contamination,
    i.    which "apparently" occurred on July 31, 2021; October 31, 2021; January 1, 2022; January 24, 2022; and May 16, 2022; and
    ii.    while on the Restricted Release List in general; and
(d) Procedural due process ("PDP") violations from Easley's placement on the Restricted Release List.

*See* Comm. Defs' Br. ("Defs' Br.") 4. Easley moved for additional time to respond to the motion for summary judgment, which was granted. Order of July 7, 2025 (ECF 107). Easley ultimately filed a brief in response postdated on July 22, 2025, which was marked received on July 24, 2025, but somehow not filed until August 6, 2025, and not entered into the docket until August 11, 2025.

## II.  **FRAMEWORK**

It is easy to skim through or past the standards of review, but it is worth taking special care here. This motion and its opposition require particular attention to the burdens and the border between a successful summary judgment motion and one that fails to clear its burden.

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only if a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986) (holding that "this standard mirrors the standard for a directed verdict" under Fed. R. Civ. P. 50(a), where "there can be but one reasonable conclusion as to the verdict"). The movant can make its showing by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Where a motion regards a claim on which the movant does not bear the burden of proof on an issue at trial, that movant can satisfy the initial burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).[3] In that situation, the moving party is entitled to summary judgment if the nonmoving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case." *Id.* at 322. This factual showing must be based on evidence in the factual record and not on conjecture or speculation. *Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017); *see also* Fed. R. Civ. P. 56(c) (evidence must be

---

[3] In this and other quotations, the Court in this opinion sometimes omits quotation marks and citations and alters capitalization without noting the alteration.

admissible to be considered at summary judgment). The Court reviews the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

As the text of Rule 56 makes clear, the movant can also claim not that there is an absence of evidence with which the nonmovant can prove its case but that the record evidence in sum is insufficient to show either materiality or genuineness of factual disputes that remain. A dispute is *material* if it addresses "facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A factual dispute over a material issue is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*[4]

This raises the nonmovant's burden and credibility determinations at the level of summary judgment. A non-moving party may not "rest upon mere allegations, general denials or . . . vague statements," *Trap Rock Industries, Inc. v. Local 825, Intern. Union of Operating Engineers, AFL-CIO*, 982 F.2d 884, 890 (3d Cir. 1992), as pleadings are not acceptable evidence, Rule 56(c)(1)(A). Conclusory statements are not facts and cannot create issues of fact. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–889 (1990). Thus, if the non-moving party's evidence "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (cleaned up).[5] The Court cannot go so far as to "weigh the evidence" or "determine

---

[4] As noted below, the present motion (almost) exclusively concerns genuineness, arguing that no reasonable jury could sufficiently disbelieve the movants' attached evidence.

[5] The movants also offer the following formulation and authority:

> The mere existence of an alternate version is not grounds for denial of summary judgment. *Saucier v. Katz*, 533 U.S. 194, 212 n.3 (2001), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009) ("[d]isputed versions of the facts alone are not enough to warrant denial of summary judgment.") (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)).

Defs' Br. 2. The movants' direct citation to *Saucier* notably omits that this is a footnote in Justice Ginsburg's *concurrence*, joined by only two other Justices. *Saucier* considered the question of whether the standard for considering qualified immunity at a motion for summary judgment was the same as that for considering the merits of the asserted excessive force claim. *Saucier*, 533

the truth of the matter," *id.* at 249, taking care to draw inferences (such as credibility) in favor of the nonmovant.

Finally, courts have frequently held that cases premised on alleged constitutional or civil rights violations are "unsuitable" for summary judgment where it would be appropriate to decide the issues only on a fuller record. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2732.2 (hereinafter "Wright & Miller"); *id.* n.19 (collecting cases denying summary judgment regarding claims of cruel punishment).

### III. <u>DISCUSSION</u>

Before embarking on the substance of the claims, it is worth pausing to consider the evidence on offer, which seriously colors the rest of the discussion.

The movants include in their motion a relatively short deposition of Easley and *no* other testimonial evidence, including depositions or affidavits. Among the 23 exhibits that are not Easley's deposition, none explains, contextualizes, or even avers the validity of any of the others. There are certainly many cases in which no testimonial evidence is necessary to demonstrate the propriety of summary judgment. Here, however, the movants were on clear notice that Easley is going to refute the truth asserted in these documents, at least through his own testimony. The deposition took place on April 2, 2025, at which time Easley testified that he had still not been able to review the paper discovery. Deposition of Warren Easley ("Depo.") 9:8–19. At that point, the

---

U.S. at 200. Because the officer was entitled to qualified immunity, despite assuming that a material issue of fact remained, summary judgment on the merits was not reached. *Id.* at 202. *Rowland*, the source of the quotation by Justice Ginsburg, is another qualified immunity case in which summary judgment on the cited merits is addressed momentarily and with nearly no analysis; *Rowland* cites for this quotation yet another case decided on qualified immunity. *See Gooden v. Howard County, Md.*, 954 F.2d 960, 965 (4th Cir. 1992) (en banc) (noting that the appellate panel and district court had believed the genuine issues of material fact sufficient to write, "if there was ever a case that cried for a trial, this is it.").

motion to extend discovery deadlines had been twice extended by motion of the Commonwealth defendants—to April 4, 2025. Order of March 5, 2025 (ECF 83). Easley's potential issues with discovery were known to defendants. He had won an order compelling the provision of discovery months prior. Order of December 18, 2024 (ECF 70). At the deposition, although Easley immediately said he had not reviewed the discovery, counsel for the movants at no time provided him documents to review and refute, despite ending the deposition after about two hours. Depo. 80:12 (concluding 2 hours and 17 minutes after it began); *id.* 41:3 (short recess taken).

Where it is obvious that the plaintiff's case is going to be made out heavily by his own testimony, the failure to confront him with defendants' evidence strongly undercuts the value of that deposition for summary judgment: How can the movants show that there is no genuine dispute of material fact if they can show so little about how Easley will rebut their evidence, and the credibility of that rebuttal?

*    *    *

I follow the movants' organization of the claims on which they move for judgment. As the Court has reviewed in its previous orders on dismissal, most of Easley's § 1983 claims are premised on the Eighth Amendment as he complains of cruel punishment, excessive force, failure to protect him, denial of medical care, deliberate indifference, and the overall conditions of his confinement at SCI Phoenix.

The Eighth Amendment prohibits the imposition of "cruel and unusual punishment." U.S. CONST. amend. VIII, manifesting "an intention to limit the power of those entrusted with the criminal-law function of government." *Ingraham v. Wright,* 430 U.S. 651, 664 (1977). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with

establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). This prohibition restrains prison officials and imposes a duty to provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "Prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of inmates." *Id*. The Eighth Amendment forbids the deprivation of the "minimal civilized measure of life's necessities," although it does not forbid merely "restrictive and even harsh" conditions that are "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

### A.  Excessive Force

The Commonwealth defendants first move for summary judgment regarding Easley's claims that excessive force was used against him. To determine whether a corrections officer has used excessive force in violation of the Eighth Amendment, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992).[6] The Court approved of taking into consideration "the need for the application of force, the relationship between the need and the amount of force that was used, [] the extent of the injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials . . . and any efforts made to temper the severity of a forceful response." *Albers*, 475 U.S.

---

[6] This standard is controversial. *See* Sharon Dolovich, *Excessive Force in Prison*, 114 J. Crim. L. & Criminology 415, 463 (2024) (contrasting Eighth Amendment standard with Fourteenth Amendment standard for pretrial detainees under *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), which permits an objective inquiry, and arguing that *Albers* "confers an extraordinary degree of autonomy and authority on precisely those state actors whose conduct most requires constitutional scrutiny").

at 321. From these, the factfinder could infer whether "the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* (citing opinion equating "deliberate indifference" standard to criminal recklessness, with quotation thereof).

### 1.   *Threat Without Physical Assault or Other Harm*

Movants argue that incidents on April 22 and April 26, 2022, both involved mere threats that are insufficient as a matter of law to state a constitutional violation, unaccompanied by any physical assault or other harm. Movants cite *Brown v. Lewis*, 865 F.Supp.2d 642, 649 (E.D. Pa. 2011) (stating that "verbal harassment and threats alone are insufficient to state a constitutional violation" but denying dismissal where complaint "appears to raise a cognizable claim that Lewis *not only threatened*" plaintiff but also transferred him to another prison in retaliation) and *Murray v. Woodburn*, 809 F.Supp. 383, 384 (E.D. Pa. 1993) ("Mean harassment . . . is insufficient to state constitutional deprivation"),[7] as well as other authorities that I find weaker. *E.g.*, *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (only restating *trial court*'s holding that "mere allegations of verbal abuse, threats or defamations by a correctional officer to a prisoner are not cognizable" before stating that "[t]his reasoning was flawed," for at least one other reason).[8]

---

[7] Movants quote this as "[m]ere harassment" rather than "[m]ean harassment." West has published the latter on its online database, although the formulation is a little unusual. I cannot find it in any context on Westlaw except the many quotations of *Murray*. Judge Katz may not have wanted to suggest that Murray's treatment in that case was "mere" anything; it came in Murray's 87th civil rights lawsuit before Judge Katz, who took care to recognize that although most of Murray's suits were not legally viable, they did not abuse his right to proceed *in forma pauperis*. *Murray*, 809 F.Supp at 384.

[8] Although the proposition has been framed as a matter of law, I do not think it is that strong. Indeed, I can imagine particularly malicious and needless verbal acts that could state cognizable claims of excessive force, such as the believable but false reporting to a prisoner of his beloved child's violent death when the officer knew it was not true but would emotionally overwhelm the prisoner. The leap from that act to a threat is not so great: Suppose the officer instead threatened to terrorize or murder the prisoner's child while off-duty. These examples are plainly not threats

Easley offers a response to the motion with respect to excessive force claims, but he does not address the incidents in which no physical force was used. Reviewing the specific threats in question, I suspect this was intentional, as Easley's own evidence supports only the mine run of violent threats and does not indicate any reason why his exposure thereto demands special consideration. There is nothing praiseworthy in a correctional officer telling a prisoner that the officer will "put stitches in the other side of [his] face" the next time he comes out of his cell, Defs' Stmt. of Undisputed Material Facts ("SUMF," ECF 96-1) ¶ 146 (citing Easley's grievance and deposition), or an officer's screaming at a prisoner and name-calling and stating "that's why he gave [him] stitches," *id.* at ¶ 149 (same). This Court is nevertheless unable to remedy under the Eighth Amendment for unprofessionalism this "mean harassment." *Murray*, 809 F.Supp. at 384.

### 2. Physical Force

Defendants next move for summary judgment regarding the allegations that included some element of physical force, arguing that these are nevertheless insufficient as a matter of law because they are not "repugnant to the conscience of mankind." *Albers*, 475 U.S. at 327; *see Reyes v. Chinnici*, 54 F.Appx. 44, 48–49 (3d Cir. 2002) ("There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically.")*; see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

Easley stated in a written grievance that on May 18, 2022, during a meeting with the Program Review Committee, Young "squeeze[d]" his arm, at which point Easley "fell to the ground"

---

against the prisoner himself. I do not mean to suggest that those kinds of threats could not rise to the level of violating the Eighth Amendment, but it is harder to imagine.

and was "dragged" to his cell, when Mateus "kicked [him] in [his] left side" and Easley was "dragged under the steps by [his] cuffs." Grievance No. 981720 (Defs' Ex. 24) at DEF 422. The grievance paper offers only limited space, which Easley exceeded, but he also elaborated on this incident in deposition. There, he stated that after Young squeezed his arm, Mateus and an unknown officer were both kicking and punching him. Depo. 43. Defendants offer evidence that Easley had been uncooperative during the Program Review Committee, and they demonstrate the lack of evidence as to any actual injury done by the squeezing, dragging, or kicking. Easley responds in his declaration, now stating that it was Mateus and Young who were assaulting him with closed fists, kicking and "attempting to pull plaintiff[']s arms in two different directions although plaintiff was not resisting." Decl. of Warren Easley (ECF 110 at 33, "Decl.") ¶ 20.

It is not for the Court to decide whose case is stronger at this point, based on an incomplete and cold record. There is no evidence before me as to the injury or pain inflicted. The motion is sufficient as far as those involved in the May 18, 2022, incident who had no role with the alleged physical assault, but every factual dispute remains as to the nature and extent of the interaction between Young, Matteus, and Easley, which are material to considering whether this incident was an 8A violation.

### B.  Failure to Protect

Defendants move for summary judgment on Easley's claim of their failure to protect him relating to an incident from October 31, 2021, during which Hamilton, Talarico, and Hall were alleged to have approached Easley in his cell and called him a "rat' within hearing of neighboring prisoners. Compl. ¶¶ 136–47. Defendants argue that the incident was already investigated by the Department of Corrections and found not to have occurred; and that even if it did occur, there is

no evidence suggesting a likelihood that such a comment would cause a risk to Easley's safety beyond mere speculation, particularly since no physical harm came to him.

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners against the unnecessary and wanton infliction of pain, . . . impos[ing] a duty upon prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (cleaned up). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society," but not every injury to one prisoner by another implicates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994). To make out a failure to protect claim, a plaintiff in the Third Circuit must show "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bristrain v. Levy*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds as recognized in Fisher v. Hollingsworth*, 115 F.4th 197, 205 (3d Cir. 2024) (as to *Bivens* only, inapplicable here). The first element is objective, based on "society's view of the risk, i.e., whether it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 257 (3d Cir. 2010). The second element is subjective, requiring Easley to show that defendants were "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and that they drew that inference. *Id.* at 259 (quoting *Farmer*, 511 U.S. at 837).

Movants do not seriously address whether the facts on this point are undisputed. They focus on the fact that their own proposed evidence, a prison investigation upon Easley's grievance, indicates that Easley's allegation is false. The grievance response initially found only that "[d]espite [his] claims, records reflect no evidence was found to support [his] claims." Grievance No. 952702

Response (ECF 96-19, Ex. 17) DEF 358. When Easley appealed the grievance response, it was overturned and remanded, but by the time the remand was investigated in April, any surveillance video had disappeared and the one witness interviewed flatly denied the allegation. *Id.* DEF 360. Easley stood by his grievance upon questioning in his deposition, Depo. 68:10–69:19, to which he was subjected to essentially no follow-up.

On materiality, movants offer *Robinson v. Danberg*, 673 F.Appx. 205, 214 (3d Cir. 2016) to support their claim that, even accepting Easley's telling, officers suggesting to other prisoners that the plaintiff is an informant is insufficient without a demonstration of actual harm suffered. As this unreported citation suggests, there is not settled law in the Third Circuit on point. Those sister circuits who have addressed the issue in reported opinions have held that there is *no* require-ment of actual harm for being labeled a snitch. *E.g.*, *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (no requirement of actual harm, noting that "[a]fter all, who better knows the opprobrium and consequent effect thereof that attaches to the label of snitch than those who work daily within the inmate population."); *Benefield v. McDowall*, 241 F.3d 1267, 1271-72 (10th Cir. 2001) (same holding); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1139 (9th Cir. 1989) (same); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (same); and *Gullatte v. Potts,* 654 F.2d 1007, 1009–12 (5th Cir. 1981) (remanding to determine whether defendant should have known that an inmate labeled a snitch is in danger). Those circuits, including our own, that have held otherwise have done so in unreported decisions. *E.g.*, *Robinson*, 673 F.Appx. at 214; *Castellano v. Treon*, 79 F.Appx. 6, 7 (5th Cir. 2003); *Thompson v. Michigan Dep't of Corr.*, 25 F.Appx. 357, 359 (6th Cir. 2002)*; Brown v. Ellis*, 175 F.3d 1019 (7th Cir. 1999) (unreported). Furthermore, the Third Circuit has held in a more recent unreported case than *Robinson* that mere risk of assault is sufficient under like circumstances, albeit supported by sufficient evidence. *Moore v. Mann*, 823 F.Appx. 92, 96–

97 (3d Cir. 2020). In lieu of binding authority on the matter, I prefer to follow the reasoning of the reported appellate authority, and I find it persuasive.

As to a genuine factual dispute, Easley has not submitted a great deal on which to base his claim. Nonetheless, where the evidence I can review demonstrates that prison officials may be partially responsible for the inability of Easley to provide more evidence in his own defense through their failure to timely investigate (and monopoly on resources within the prison), I may deny the motion. Fed. R. Civ. P. 56(d)(1). Certainly, Easley has provided essentially no evidence, in his declaration or otherwise, on the facts relating to other prisoners' dangerousness or likelihood to come to violence, which would go to the objective element, or on the officials' knowledge of the risk that calling him a "rat" would endanger him, to the subjective element. It may be sufficient, however, to gather indication of these from the Intensive Management Unit and Behavioral Management Unit handbooks, Defs' Exs. 2 and 3 (ECF 96-4 and 96-5), each of which indicates that those units were intended as specialized programs for prisoners who were (presently) unsuitable for the general population, which might suffice to indicate both the objective and subjective elements, *see* Transfer Log, Defs' Ex. 5 (ECF 96-7) (indicating Easley was housed at "IMU" on October 31, 2021); Depo. 63:9–10 ("IMU" means "Intensive Management Unit"), as well as Easley's deposition about the seriousness of the crimes of his fellow IMU inmates, depo. 69:4–13. In combination with Easley's evidence indicating that the prison officials at times refused to document or to save documentation that would have served him, I will deny the motion.

## C.  Conditions of Confinement

Although the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), the Supreme Court has interpreted the Eighth Amendment's prohibition on cruel and unusual punishment to impose upon prison officials the responsibility to "provide

humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (cleaned up). The Third Circuit has set out two requirements for a conditions of confinement case under the Eighth Amendment: First, the deprivation alleged must be "sufficiently serious" by an objective measure, including where "an inmate is deprived of the minimal civilized measure of life's necessities" *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020). Second, the prison official must have a "sufficiently culpable state of mind," including through "deliberate indifference to the inmate's health or safety or conditions of confinement that violated the inmate's constitutional rights." *Id*.

### 1.  Due to Cell Contamination

Defendants move for summary judgment as to each of the five occasions on which Easley claims he was housed in a contaminated cell that defendants refused to clean.

### 1.  July 30, 2021

Easley alleges that he was confined to a cell without the use of toilet paper from July 30, 2021, to August 2, 2021, and therefore left to smear his own feces on the cell walls and door. Compl. ¶ 129–31.[9] Movants claim that an investigation done after Easley submitted a grievance

---

[9] The movants mischaracterize Easley's allegations in part. Easley's complaint includes the following paragraphs, reproduced from his handwriting as I read it:

> 129. On 7-30-21 plaintiff was placed in a mental health P.O.C. cell due to attempt of suicide while plaintiff was in the P.O.C. cell under constant watch he was to be viewed and watched 24-7.
> 130. Plaintiff continued to have mental health issues and due to **refusal** of toilet paper plaintiff covered his whole door with Feces to the point plaintiff could not be seen in cell.
> 131. Plaintiff was left in this cell Filled with Feces For over 72 hours From 7-30-21 to 8-2-21.

Compl. ¶¶ 129–31 (emphasis and capitalization original). The movants' summary of these paragraphs is "Plaintiff alleges that, on July 30, 2021, he was refused toilet paper while in his cell and, as a result, decided to smear his own feces on the door of his cell in order to prevent staff

on this matter shows that this did not happen, since Easley did not mention this while speaking with a psychology staff member on August 2, 2021, instead saying that he had no issues or concerns to report.  Movants also argue that the investigation cleared Patterson, Reber, Nicholson, and Phillips of having actual knowledge of the issue, in part based on Easley's allegations of their knowledge being "refuted by the investigation conducted by the Pennsylvania Department of Corrections, which explain [sic] that no such contamination occurred as described by Plaintiff." Defs' Br. 16.

Easley responds by citing Nurse Barbara Herbst's notes, in which the nurse wrote on August 1, 2021, "Has his camera covered - has BM smeared on windows at cell door - Security Aware - has no reading material order - Inmate can be seen with a flashed [sic] through the side windows - Lying on his bed face down – movement noted – Continues on a 1:1." Pl's Ex. 8, ECF 110 at 190. The same page of notes includes "Subjective: Has no complaints" and "Assessment: In the POC due to Suicidal Ideation." *Id.* Notes from the following day include this update: "Inmate's cell door window smeared up with feces, heard inmate yelling something I could not understand." *Id.* at 196.

Movants claim that there is no genuine dispute of the facts because of prison officials' own investigation, from which they conclude "Plaintiff was not confined to a contaminated cell." Defs' Br. 15–16. This argument is unserious. The prison nurse's notes themselves, attached to Easley's motion but almost certainly received from the defendants in discovery, characterize Easley's cell as being unclean with smeared feces. A record in which the nurse wrote "movement noted" can hardly be taken at face value where it also contends that the prisoner "[h]as no complaints," *id.* at

---

members from looking into the cell." Defs' Br. 15 This reading imputes more to Easley's intent (and overall mental state) than can be fairly read.

190, and certainly not where the movants know that their documentation, to the extent it can be believed, indicates at least that the cell was in fact smeared with feces.

As to materiality, movants do not argue that, if the cell were contaminated by feces, they would nevertheless be cleared of constitutional violations. I therefore deny the motion on this point.

### 2. October 31, 2021

Easley alleges that he was left in a cell for fourteen days, starting on October 31, 2021, that was the contaminated with pepper spray ("oleoresin capsicum spray," or "o/c"). Compl. ¶¶ 148–52.[10] Movants argue that a department investigation after his grievance "revealed there was a complete absence of evidence substantiating" this grievance. Defs' Br. 17. Instead, they claim, the investigation showed that Kull requested on that date that Easley leave his cell to have it decontaminated, but Easley refused, and that Easley later failed to make any complaint over the following weeks.

Easley responds by reference to his Exhibit 10, although Exhibit 9 is the more likely citation, reproducing a portion of the movants' Exhibit 18 (ECF 96-20). It is a grievance slip from the same date showing Easley's reporting of the alleged pepper spray conditions. It has a receipt stamp of "Dec 07 2021," and it is followed by an order remanding it for further action after an improper denial, signed once on January 20, 2022, and by the higher-up on March 23, 2022. Pl's Ex. 9. First, as the movants' own evidence shows, the grievance was ultimately *upheld* in part, albeit somewhat unclearly, indicating that the reason pepper spray was used was due to Easley's being uncooperative and assaulting officers, including by throwing an unknown liquid. Defs' Ex. 18 at DEF 373. Of course, again, none of the evidence reviewed by the prison officials is attached or available.

---

[10] October 31, 2021, was also the date of the failure to protect claim discussed *supra* at § II.B.

As in the previous section, the movants have totally failed to show that there is no genuine factual dispute, nor have they argued that the facts alleged and supported by the grievance and the affidavit (and supported partially by the declaration) are immaterial. I therefore deny on this point as well.

### 3. January 1, 2022

Easley alleges that on January 1, 2022, he was pepper-sprayed and then left in a cell that was contaminated by the pepper spray, despite his having written to Sorber and Mascilino. Compl. ¶¶ 153–56. The movants' arguments echo those in the October 31, 2021, incident, including reliance on the prison's own conclusory report, although this time with the advantage of a clarification in the record: "Plaintiff conceded he only remembers allegedly notifying Commonwealth Defendant Sorber, and not Commonwealth Defendant Mascilino." Defs' Br. 20 (citing Depo. 59:12-15). "It logically follows, Plaintiff has not produced any evidence demonstrating Commonwealth Defendant Mascilino had 'actual' knowledge of said contamination." *Id.*

This is the weakest point of the motion. As noted, during Easley's deposition, he complained that he had not yet received paper discovery, so he was working off his memory of events that occurred years before. The Court has the advantage of the exhibits. A grievance slip submitted on January 17, 2022, attached *by the movants* as Exhibit 19 (ECF 96-21) at DEF 385, helpfully provides a somewhat contemporaneous record: "I initiate this grievance against superintendent Sorber, Major Mascilino, . . . I initiated a DC-135 to Sorber and Mascilino (enclosed) which I received no response which mean they contribute to such civil conditions." Later in Exhibit 19 is, even more strikingly, a copy of the letter addressed to "Superintendent Sorber / Major Mascilino" dated January 1, 2022, in which Easley complains of his contaminated cell. *Id.* at DEF 392.

In short, movants' argument as to Mascilino is based on the plaintiff forgetting something at a deposition years later that is squarely proven by the movants' own exhibits. This moves the

needle from unserious to frivolous. It also fails for reasons that echo the previous sections, *i.e.*, for failing to argue why the genuinely disputed facts are immaterial. I therefore deny on this point as well.

### 4.  *January 24, 2022*

Easley alleges that on January 24, 2022, he was transferred to a cell that was contaminated with another prisoner's blood, feces, and urine, despite Sipple's awareness of the circumstances. Compl. ¶¶ 158–61. Movants argue that Easley has the date wrong, and that he was not moved to the new cell until January 25, 2022. They also again argue that the conclusion of their *own* investigation was that Easley's new cell was not contaminated, and that Easley failed to report any concerns to staff members during the relevant period.

According to the transfer log attached to the motion, Easley was transferred to a new cell on January 25, 2022 at 7:53:51 AM. Defs' Ex. 5 at 4. Because no declarations or even instructions were submitted with the motion, I do not know whether the timing on the transfer log means the time that Easley was assigned to the new cell, when he entered the new cell, or perhaps just when the logging officer remembered there had been a change the night before. During late January, the sun rises relatively late. For someone who was apparently going through his own mental health crisis, it seems possible that, while being moved between cells, he might not have processed that midnight had passed. *See* Cumulative Adjustment Records, Defs' Ex. 7 (ECF 96-9) at DEC 260 (noting that Easley had been on a hunger strike for two weeks at the time of this offense).

Beyond the issue of the date, since the motion again relies on the apparently genuinely contested conclusions of the officials' own investigation and does not offer any argument as to why they are immaterial, I deny on this point as well.

### 5.  *May 16 to June 3, 2022*

Finally, Easley alleges that on May 16, 2022, he was transferred to a cell that lacked a mattress, sheets, blankets, toilet paper, or food trays, and that Young, Hall, and Luquis encouraged a neighboring prisoner to flood Easley's toilet and disrupt his sleep. Compl. ¶¶ 162–66, 169–70. Movants again claim that there is no evidence of his raising any of these concerns. Easley did testify on this point to contradict that finding, Depo. 61:17–68:8, and briefly touched on the same in his declaration, Decl. ¶ 10. Movants' claim that "[a]s the undisputed material facts show, Plaintiff did not report any of the alleged conditions to any staff member," Defs' Br. 24, is hard to square with the deposition, at which Easley accuses the relevant defendants of having been actively participating in the deprivations, Depo. 65:2–66:17. If the contention is that Easley did not report and therefore is not credible, that determination is for a jury to decide. If the contention, however, is that the prison officials had no subjective knowledge of the alleged abuse, the officials will have the opportunity at trial to prove that they were unaware of their own actions.

Finally, the movants argue in footnote that the constant illumination of Easley's cell alone could not rise to the level of an Eighth Amendment violation, citing only *Stewart v. Beard*, 417 F. Appx. 117, 119–20 (3d Cir. 2011) (unreported). After noting that "constant illumination can rise to the level of an Eighth Amendment violation" under other circumstances, at least per the Ninth Circuit, the court distinguished the matter because the plaintiffs there had access to something with which to cover their eyes, and they suffered no apparent health issues. *Id.* at 119–20. First, Easley does not claim that the constant lighting *alone* was a violation. Second, Easley has clearly testified that he had access at this point to nothing, *not even toilet paper*, with which he could cover his eyes. Depo. 62:11–21. Third, Easley suggests the effects of the lighting as part of the effects of the overall conditions, which he declares caused him to "continue[] to struggle and exacerbate" mental health issues, with both suicidal ideation and attempt. Decl. ¶¶ 13, 16. I deny on this claim.

### 2.  Conditions on the Restricted Release List (8A)

Easley's final claim under the Eighth Amendment reached by this motion is that for the several years he was on the Restricted Release List, a particular kind of confinement in the Pennsylvania prison system, he was effectively subject to conditions of solitary confinement, such as a very short period to eat, low quality food, the use of restraints, inability to socialize or join programming, lack of physical contact with visitors or anyone else, lack of meaningful interaction with prison officials and staff, limits to personal property in his cell, only three showers weekly, and constant artificial lighting. Compl. ¶¶ 257, 265, 267.

Over the course of the nearly six years that Easley has been on the Restricted Release List, he has been housed in various units and in different facilities, the policies of which are reproduced in part above. *See generally* SCI Phoenix Intensive Management Unit Inmate Handbook 2022, Defs' Ex. 3 (ECF 96-5); Behavior Management Unit Inmate Handbook SCI Rockview, Defs' Ex. 4 (ECF 96-6). Movants offer a wide array of privileges to which Easley had access while in what he refers to as essentially solitary confinement. For instance, while Easley was at SCI Forest and SCI Houtzdale and on the list, he

> held an employment position within the facility, engaged in telephone calls with family, had access to a television and radio, visited with family and friends, accessed the facility law library, had access to leisure reading materials, had the opportunity to exercise five days a week and shower and shave three days a week, and had access to educational services, commissary, religious guidance, and recreational programs. Additionally, Plaintiff was regularly visited and personally seen, nearly daily, by corrections counselors and licensed medical professionals who provided [*sic*] with mental health assessments.

Defs' Br. 28 (citing their SUMF ¶¶ 19–20, 51–52, 86–87). Further, while at SCI Phoenix in the Intensive Management Unit, he was in "Phase Six" and "Phase Five" of the program, in which he

> engaged in educational programming, telephone calls with family and friends, had access to a tablet, television, and radio, had weekly

> contact visits with staff members and psychology staff members, had one video visit a week, had the opportunity to exercise outside of his cell for two hours a day seven days a week, had the opportunity to shower three times a week, and had access to commissary, law library, recreational books, and in-cell games;

and

> engaged in out of cell group programming, educational programming, two hours of out of cell exercise a day seven days a week, showers three times a week, had one video visit a week, in-cell programming, telephone calls with family and friends, had access to a tablet, television, and radio, had weekly contact visits with staff members and psychology staff members, and had access to commissary, law library, recreational books, and in-cell games;

respectively. *Id.* at 28–29. Finally, while at SCI Rockview and SCI Frackville, where he was housed on the Behavioral Management Unit, he "participated in at least twenty hours of out of cell structured and unstructured activities each week, including watching movies with other inmates and participating in group activities with other inmates," and was "regularly visited and personally seen, nearly daily" by counselors and medical professionals. *Id.* at 29–30.

The mere fact of being in "administrative custody," the "restricted release list," "solitary confinement" or whatever alternative on offer, is insufficient on its own to demonstrate a violation of the Eighth Amendment. The Third Circuit has "acknowledged the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation" including a "growing consensus that solitary confinement conditions can cause severe and traumatic psychological damage." *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (cleaned up). But finding a violation is based not on the name of the housing but on whether facts about the conditions of custody themselves demonstrate deprivations of "the minimal civilized measure of life's necessities." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). Where a plaintiff shows "no evidence that he was denied basic human needs, such as food, clothing, shelter, sanitation, medical

care and personal safety," he cannot succeed in his claim, regardless of his unit's classification. *Id.* Where there is some evidence, the circuit has resisted laying out any "static test" against which prison conditions can be judged, because "cruel and unusual punishment is measured by the evolving standards of decency that mark the progress of a maturing society." *Young v. Quinlan*, 960 F.2d 361, 359 (3d Cir. 1992) *superseded on other grounds as recognized in Nyhuis v. Reno*, 204 F.3d 65, 71 n. 7 (3d Cir. 2000). Thus, there is no maximum duration for restrictive housing, after which it may no longer be constitutionally imposed. *See Wayne v. Wetzel*, No. 21-4209, 2024 WL 3696467 at *8 (E.D. Pa. Aug. 7, 2024) (granting summary judgment for officials where plaintiff's confinement to segregated housing for seven years did not violate Eighth Amendment). Neither is there a clear minimum period which is always constitutionally permissible. *See Palakovic v. Wetzel*, 854 F.3d 209, 217 (3d Cir. 2017) (violation where officials put suicidal prisoner into solitary confinement for multiple, discrete 30-day periods).

After laying out this framework of a fact-based determination, movants argue that the privileges provided to Easley in the units under which he was housed were "privileges which this Court has deemed not to violate the Eighth Amendment." Defs' Br. 27. There are three issues with this argument: First, as in previous sections, it severely understates a genuine dispute over the facts. In his deposition, Easley repeatedly could not recall aspects of the conditions in particular programs, but he flatly denied receiving the kinds of regular psychiatric and social management that the programs promise, accusing staff of having falsified records to the contrary. Depo. 78:22–79:2.[11] The movants' assurance in briefing that he was given these privileges is no assurance at this level.

---

[11] Easley responded that he "did not recall" when asked about several provisions of the conditions that were supposed to have been provided to him. It is impossible to be certain from the deposition text whether he intended that he could not provide any answer for lack of memory, whether he could not recall a specific instance of the particular provision, or whether he was

Second, the movants' argument glides past, among other things, the specific instances discussed in every section above. Put simply, the fact that a prisoner in ABC program is guaranteed access to daily showers and contact visits is of little moment to the constitutionality of the actual conditions if the prisoner is also repeatedly returning to a cell that is contaminated with his own and others' feces and bodily fluids.

Finally, building off the last point, the movants rely heavily on certain aspects of the conditions of Easley's confinement taken piecemeal, like the duration of his time on the Restricted Release List and particular programming that was at least promised during those times. This fails by neglecting even to make the argument with any citation to authority that the whole constellation of facts is not unconstitutional as a matter of law. *Cf.* Local Civ. R. 7.1(c).

---

unable to remember whether something was provided to him during his time in a specific unit. This excerpt provides an example:

> Q. But while you were in the IMU, did you receive the two hours of yard time seven days a week?
> A. Not that I recall. I don't recall.
> Q. The most restricted phase also permits one phone call a week. Do you remember if you received one phone call a week?
> A. I do not recall. I don't recall anything about the phases. They wasn't giving us anything about the phases. We really never was given nothing about the phases. And are you asking me for my experience? I just don't recall. So much has happened since then. I just don't recall nothing about the phone. I don't recall.
> Q. Okay. So are you saying -- I would prefer to go through these questions. There's a few. Just asking about your experience in the IMU, not whether you were told these things. But whether you --
> A. My experience?
> Q. Yes.
> A. I don't recall about the phone. My experience, I truly do not recall about the yard. I know we weren't allowed to come out for groups at all. I don't recall anything about the showers. I just know we were given limited property and just sit in a cell.

Depo. 77:25–78:24.

There is a great deal of evidence in this case that was not presented at the summary judgment stage, if it has been explored at all. I do not have before me depositions or affidavits from any prison officials or prisoners or other witnesses. Of the documents I have seen, a number are insufficient (and inadmissible) without a live witness to explain them and undergo cross examination, particularly in light of Easley's denials. *See supra* § III.C.1.a. (regarding the nurse's notes). Easley's declaration leaves much to be desired, but so too does his deposition, and that was not for any unwillingness on Easley's part to give responses or any other apparent limitation. In sum, the movants have failed to show in nearly any aspect thus far that the material facts are sufficiently undisputed, or that Easley's disputes are not genuine. For that reason, I again deny summary judgment on this point.

### D.  Placement on the Restricted Release List (PDP)

Finally, the Commonwealth defendants move for summary judgment on Easley's claim that his placement on the Restricted Release List was unlawful under the Due Process Clause of the United States Constitution. In our previous memorandum considering the Commonwealth defendants' motion to dismiss, this Court addressed the legal framework for this claim, which requires both a showing of a liberty interest as well as a failure to provide due process. For the liberty interest, the Third Circuit established a two-factor inquiry: (1) the duration of the challenged conditions, and (2) whether the conditions overall impose a significant hardship in relation to the ordinary incidents of prison life. *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000). Easley's placement on the restricted release list is approaching the eight-year duration in *Shoats*. *Id.*

Whether the conditions of his confinement overall imposed a significant hardship beyond ordinary prison life is at issue, as are even the facts surrounding the process that Easley was afforded in deciding his continued placement. As with previous sections, the movants' argument is

principally based on the procedures that were *supposedly* or *supposed to be* afforded to Easley. No affidavit or testimony is offered as to whether those procedures were followed or how. A number of "vote sheets" are attached as exhibits showing evidently the reasoning for Easley's continued placement on the restricted release list, but these suffer from the same inability to prove their own truth in light of Easley's denials.[12] Of course, the movants were aware of the scope and nature of Easley's denials from deposing him, or they should have been, *see supra* note 10, but their motion nevertheless relies on the Court finding their paperwork credible and not him.[13] This is enough to find that the motion fails to meet its burden on both the conditions and the process supplied, and therefore I deny on this point as well.

---

[12] The question is not whether these materials are, at this point, inadmissible hearsay. The admissibility of evidence attached to a motion for summary judgment is not the same as the admissibility of evidence at trial. *See* Fed. R. Civ. P. 56(c)(1). In any event, this evidence is not being used for the same purpose now as it might be used later. Whereas at trial these documents might be entered to demonstrate that the factfinder should not believe Easley has carried his burden of proving process violations, they are entered here to demonstrate that no genuine issue of material fact exists. They are far from incontrovertible, and indeed insufficient to "foreclose the possibility" of Easley's charges. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). Again, a movant who will not bear the final burden at trial "must show why the opponent's allegations of fact are insufficient to support the claim for relief as a matter of law or why the court should conclude that its opponent lacks sufficient evidence." 10A Wright & Miller § 2727.1.

[13] Easley as plaintiff will have the burden of proof at trial. At the summary judgment level, movants might have argued that Easley simply lacks (admissible) evidence sufficient to prove his case, but that is not the motion they make here. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (moving party can prevail by simply showing that nonmovant has insufficient evidence to win at trial). Indeed, Easley's attachments to his opposition would not be sufficient to prevail at trial, and he would have to contend with several serious arguments about his credibility. Yet, although this theory of summary judgment is substantially all that the movants' Standard of Review section addresses, it is not the substance of any section of the movants' briefing, which focuses on the lack of any disputes. Easley would therefore not have been on notice that he had to show in his opposition that he has sufficient evidence to support his claims.

## IV.  <u>CONCLUSION</u>

For the above reasons, I will issue an order granting in part and denying in part the Commonwealth defendants' motion for summary judgment.